Town of New Haven *v.* Sheffield.

## SUPREME COURT OF ERRORS.

### NEW HAVEN COUNTY, SEPTEMBER TERM, 1861.

Present,

HINMAN, C. J., ELLSWORTH, AND BUTLER, Js.

TOWN OF NEW HAVEN *vs.* JOSEPH E. SHEFFIELD.

The statute of 1702, with regard to gifts to charitable uses, provides that all lands and estates that have been or shall be given or granted for the maintenance of the ministry of the gospel, or schools of learning, or for the relief of poor people, or for any other public or charitable use, shall forever remain and be continued to such use, and shall be exempted out of the general list of estates and free from the payment of rates. Certain land conveyed in 1765 to a religious society and its assigns, for the support of the ministry, was in 1858 sold by the society and conveyed in fee to the purchaser. Held, that it was not exempt from taxation in the hands of the purchaser.

AMICABLE submission to the superior court upon an agreed statement of facts, with regard to the liability of certain real estate of the defendant to taxation.

The land in question, from the year 1765 down to the 21st day of June, 1858, was owned by the parish of Trinity Church in New Haven, at which latter date it was, by a vote of the parish, sold and conveyed in fee to the defendant, who had ever since owned it. It was claimed by the defendant to be exempt from taxation under the statute of 1702, which is as follows :—" That all such lands, tenements, hereditaments, and other estates, that either formerly have been or hereafter shall be given and granted, either by the general assembly of this colony, or by any town, village, or particular person or persons, for the maintenance of the ministry of the gospel in

any part of this colony, or schools of learning, or for the relief of poor people, or for any other public and charitable use, shall forever remain and be continued to the use or uses to which such lands, tenements, hereditaments or other estates have been or shall be given and granted, according to the true intent and meaning of the grantors, and to no other use whatsoever ; and also be exempted out of the general lists of estates, and free from payment of rates."

On the 31st of October, 1765, Enos Alling, by deed of that date, conveyed to the parish of Trinity church, then and ever since a corporation, a tract of land in the city of New Haven, situated on the southwest corner of Chapel and Church streets, and embracing the land in question, the material part of which deed was as follows :—" For the consideration of £271. 5s. lawful money, received to my full satisfaction of Timothy Bonticon and Isaac Doolittle, church-wardens, and Christopher Kilby and Stephen Mansfield, vestrymen, of Trinity church in New Haven, and the rest of the members of said Episcopal church, do give, grant, sell and confirm unto the said Timothy Bonticon, Isaac Doolittle, and the rest of the professors of the church of England, and members of said Trinity church, for the time being, and to their successors, a certain piece or parcel of land [describing the premises.] To have and to hold the said bargained and granted premises, with all the appurtenances, unto them, the said grantees, and their successors and assigns forever, to their own proper use, for the support and maintenance of said church."

The premises had been conveyed to the said Alling in fee simple, by a former owner, on the 12th day of September, 1765, for the same consideration. Immediately after the execution of the deed to the parish, it went into possession of the premises, and having divided them into building lots of convenient size, leased them to different individuals, and received the rents and income thereof, and applied the same to the support of the church down to the time of the sale to the defendant. The buildings from time to time erected, and owned by the lessees of the several lots and their assigns, had always been put into the list, and the taxes paid thereon, by the owners;

but from the time of the conveyance to the parish, down to the time of the conveyance by the parish to the defendant, no part of the land on which such buildings had been erected had ever been put into the list, or any taxes paid thereon.

The clause of the statute of 1702, exempting the estates referred to from taxation, was repealed in 1821.

Upon these facts the question was submitted to the court whether the land held by the defendant was liable to taxation, and if it should be held to be the court was to render judgment for an amount stated in favor of the plaintiffs, otherwise for the defendant. The superior court reserved the case for the advice of this court.

*C. R. Ingersoll,* for the plaintiffs.

It may be conceded by the plaintiffs that the land was originally granted to Trinity church for a public and charitable use, within the meaning of the statute of 1702, and that by the conveyance to the defendant it has become divested of any such use. It however results from this that " the true intent and meaning " of the grant to Trinity church was, that the land might be thus alienated at pleasure, and should remain subject to the particular use only so long as it should remain in the possession of the church. The plaintiffs therefore claim that the land, being no longer subject to such public use, is no longer exempt from the public taxes.

1. The primary object of the statute of 1702, (it being a simplification of the statute 43 Eliz. of charitable uses,) was to carry into effect " the true intent and meaning " of the grants therein mentioned. That intent being satisfied, the statute had nothing further to do with the land. If, for example, the land in question had been charged by the grantor with the charitable use in perpetuity, the statute would have secured it to such use " forever," and the land would have always remained subject to the operation of the statute. But if the land had been granted to the church for a determinate period, as during the ministry of the then rector, the statute would have accomplished its work by securing the land to such use during the period the grantor intended it to be so used, and

thereafter the land would remain as if the statute had never existed.   And so, in the present case, the statute has had the effect to secure the land to the use intended by the grantor during the period he intended it to be so used, but, the church having parted with it, there no longer remains any " intent and meaning of the grantor " to execute.   Now it seems clear that the later provisions of the statute are but incidental to this main object.   The land was to be exempt from taxation because it was to be used for the public good.   The language of that part conferring the privilege is certainly not more extensive than the language of that part restricting the use, and while there is manifest reason for exempting from the public burdens property devoted to public uses, it is difficult to see any reason for continuing the exemption after the property has been voluntarily diverted from such use.   Suppose even that Trinity church, while in possession of the land, had appropriated its income to objects not within " the true intent and meaning " of their grantor, could they, at the same time, have claimed the statute privilege of exemption ?   If not, they certainly can not grant to another what they never had, the land discharged of the charitable use, and yet privileged with an exemption from taxation.   But, in the case supposed, such an appropriation would be contrary to " the true intent and meaning of the grantor."   In the present case the alienation is consistent with that intent.   Much stronger therefore becomes the reason why the privilege should no longer continue.   Again, the legislature could not have intended such a construction of the statute as would lead to the consequences which result from the construction claimed by the defendant.   The land in question was not a gift to the church. It was bought " for the consideration of £271 5s."   Suppose now it had been exchanged by the church for other land, and a deed taken with a similar *habendum*, would both parcels have remained for ever free from taxation ?   And if so, could this operation have been repeated *ad infinitum* ?   But personal estate was within the statute equally with land.   (*Atwater* v. *Woodbridge*, 6 Conn., 223.)   Suppose bank stock had been taken in exchange, would that specific stock thereupon become,

and thenceforth and forever continue to be, exempt from taxation, no matter into whose hands or through how many hands it might pass ?

2. From this view of the statute of 1702, it results of course, that no obligation of any contract between the state and the grantor of the church has been impaired by its repeal in 1821, or by the provision of the act of 1859 with regard to its taxation after alienation. Revision of 1821, tit. 56, sec. 3. Acts 1859, chap. 61. It is not reasonable to suppose that the grantor of the church expected to secure for this land a perpetual immunity from the public burdens, when he only intended to charge it with a temporary use for the public benefit. His object was to secure to the uses of the church a certain estate which the church could manage and vary as their interests should require. The power of alienation given by the deed is consistent with no other supposition. If he based any expectation at all on the statute, it could have been none other than this, that inasmuch as the estate or fund which he was providing was what he designed to be secured to the charitable use " forever," so the privilege of exemption was to attach to that fund while so used for the favored purpose, and not to the particular pieces of property which might from time to time compose it. " The object of the legislature unquestionably was," says Judge Church in *Landon* v. *Litchfield*, 11 Conn., 271, " either to render lands which had been sequestered to public or pious uses inalienable ; or to limit the exemption or privilege attached to them to the public or pious use to which they were actually appropriated ; and that while such lands were contributing to the furtherance of public or pious objects, they should be exempted from the further and additional burden of taxation."

3. This construction of the statute of 1702 is recognized by all the decisions of our courts upon the subject. The leading case is *Atwater* v. *Woodbridge*, 6 Conn., 223, and there the court explicitly say, by Brainerd, J., " It appears to me that property given under the statute, so long as it is applied to the uses designated, must forever retain the rights and privileges attached to it at the time of the grant." In this case, it will

be remarked, the fund was personal estate, being the avails in part of " land " originally granted for the support of the ministry. But the fund was held exempt, not the land or other property which, in the course of its management, had been exchanged for other investments. *Osborne* v. *Humphrey*, 7 Conn., 335, (decided by three judges,) follows *Atwater* v. *Woodbridge*. The opinion of the court is remarkably barren of any discussion of the principles upon which the decision was based, but it is evident that nothing more was intended to be decided than had already been decided in *Atwater* v. *Woodbridge*. The language above quoted was cited approvingly, and the question in hand spoken of as " the precise question " decided in that case. The case of *New Jersey* v. *Wilson*, 7 Cranch, 164 was also cited. But when Judge Peters said that these cases were decided upon similar principles, he meant nothing more than that they both rest upon the principle that a contract may be created by a legislative act. He certainly did not mean to say that the contract created by the Connecticut act was the same as the contract created by the New Jersey act—for in the one case, as his citation shows, the property was to retain its privileges " so long as it is applied to the uses designated," while in the other, the land was forever to retain the exemption, no matter to what uses it was applied or by what occupants it was possessed. In the argument of the plaintiff's counsel it was suggested that " if the lease of 1742 were a conveyance in fee it would make no difference." But the court are careful to avoid such a conclusion, and therefore they decide that the lands had not been conveyed in fee, but were held under a lease, the fee still remaining in the society, and of course still subject to the pious use. In *Parker* v. *Redfield*, 10 Conn., 490, the cases above mentioned are recognized as authority, but with the remark that " no rule of public policy requires that the principles of that and the other cases on this subject should be extended ; " and therefore the court hold that, although, if the church itself erects buildings on the land, the buildings as well as the land become exempt from taxation, yet if the church sees fit to grant to

another the right of so erecting buildings, the exemption is to that extent lost, and the buildings, in the possession of their assignee, become taxable.    Does not public policy much more require that when the entire interest in the land is parted with the exemption should to the same extent be lost ?    *Landon* v. *Litchfield*, 11 Conn., 251, was similar in its facts to *Osborne* v. *Humphrey*.   The lands had not been conveyed in fee, but only leased ; and the disposition exhibited in *Parker* v. *Redfield* to restrict the influence of the prior decisions, was in this case still more distinctly manifested.    The court, even upon the principal question, whether any contract at all was created by the statute of 1702, were divided, and Judge Church gave a dissenting opinion, which must be confessed to be a very able one.    The case of *Hart* v. *Town of Cornwall*, 14 Conn., 228, is further evidence of the disinclination of our courts to extend the authority of the prior cases.    In all of these cases the fee of the property which was held to be exempt, was still in the party to whom it had been granted, and in whose hands it was secured to the charitable use.    In none of them therefore was there any question involved, such as that decided in *New Jersey* v. *Wilson*, respecting the rights of a party to whom the fee might be conveyed.    And the present case, and indeed any case occurring under the Connecticut statute, is clearly distinguishable from the case of *New Jersey* v. *Wilson*.    The lands in that case were not charged with any use.    It was no part of the consideration for the exemption, nor any reason for its being granted, that the Indians should use the lands for any particular purpose, or even occupy them.    Even if any such reason existed at the time of the sale, it was waived by the subsequent permission to sell ; and, at the time when the sale was made, the Indians held the land in fee simple absolute, with a perpetual exemption from taxation annexed, because that was what they had bargained for.    The grant to them was co-extensive with their grant to the state, both being in perpetuity.

*Baldwin* and *Beach*, for the defendant.

1.  The land in question falls within the provisions of the act

of 1702, exempting from taxation lands granted to charitable uses. The case of these very lands was before this court in the case of *Parker* v. *Redfield,* 10 Conn., 490, where Bissell, J., in giving the opinion of the court, p. 495, says :—" Were then, the lands in question conveyed to charitable or pious uses, within the meaning of the act of 1702 ? We are all of opinion that they were so granted, and are thus within the provisions of that statute." See also *Osborne* v. *Humphrey*, 7 Conn., 339.

2. This exemption has not been affected by the act of 1821, repealing the exemption clause of the act of 1702. " It appears to me that property given under the statute, so long as it is applied to the uses designated, must forever retain the rights and privileges attached to it at the time of the grant; that the government made a contract with all such persons as might be disposed to give their property to these religious purposes and charitable uses, that it should forever be exempted from taxation ; that a right in the grantees, donees, devisees or legatees became vested, which no subsequent legislature could divest. They had a right at all times to prescribe the terms on which any future grants or donations should be made or given, but I think they have no constitutional right or power, either directly or indirectly, to impair former grants, or to lessen their natural productiveness. Taxation may be a worm at the root, which in its consequences may destroy both root and branch." Brainard, J., in giving the opinion of the court in *Atwater* v. *Woodbridge*, 6 Conn., 230. " Have the legislature a constitutional right and power to repeal this exemption and direct this assessment ? This court has said no. And a higher tribunal has said the same." Peters, J., in *Osborne* v. *Humphrey*, 7 Conn., 340. " It has been contended that, admitting the grant of 1765 to have been within the provisions of the act of 1702, the land is not therefore exempted, inasmuch as that statute was repealed in 1821. This point has been so recently and so fully considered, in the cases of *Atwater* v. *Woodbridge* and *Osborne* v. *Humphrey*, that it ought not to be drawn again into discussion." Bissell, J., in giving the opinion of the court in *Parker* v. *Redfield,* 10

Conn., 495.   See also *Landon* v. *Litchfield*, 11 id., 260.   " It is quite too late now, to contend that the legislature may not modify or restrict the future exercise of its own powers. There is, perhaps, no more essential or perfect right of sovereignty than the right and power of taxation.   Yet a legislature may, by contract, even relinquish this right over a limited and specified territory, and for an object promotive of the public good."   Church, J., in *East Hartford* v. *Hartford Bridge Co.*, 17 Conn., 93.

3. The exemption has not been destroyed by the conveyance of the land by the original grantees to the present defendant. A question very similar to this was decided in accordance with our claim by the supreme court of the United States in 1812, in the case of *New Jersey* v. *Wilson*, 7 Cranch, 164.   The legislature of New Jersey in 1758 ceded to the Delaware Indians certain lands belonging to the province, in exchange for certain lands relinquished by the Indians, and by statute declared that the lands so ceded should not thereafter be subject to taxation.   In 1801 the Indians obtained an act of the legislature authorizing a sale of their lands, and in 1803 the commissioner under the act conveyed the lands to the plaintiffs.   In 1804 the legislature repealed that part of the act of 1758 which exempted the lands from taxation.   The lands were then assessed, and the taxes demanded, for which an action was brought, and the highest court in the state decided that the repealing act was valid and the lands liable to taxation.   This decision, on a writ of error in the supreme court of the United States, was reversed.   In delivering their unanimous opinion, *Marshall, C. J.*, said :   " The question is narrowed to the inquiry whether in the case stated a contract existed, and whether that contract is violated by the act of 1804.   Every requisite to the formation of a contract is found in the proceedings between the colony of New Jersey and the Indians.   The subject was a purchase on the part of the government of extensive claims of the Indians, the extinguishment of which would quiet the title to a large portion of the province.   A proposition to this effect is made ; the terms stipulated ; the consideration agreed upon, which is a tract of

land with the privilege of exemption from taxation; and then, in consideration of the arrangement previously made, one of which this act of assembly is stated to be, the Indians execute their deed of cession. This is certainly a contract. The privilege, though for the benefit of the Indians, is annexed by the terms which create it to the land itself, not to their persons. It is for their advantage that it should be annexed to the land, because, in the event of a sale, on which alone the question could become material, the value would be enhanced by it. The land has been sold with the assent of the state, with all its privileges and immunities. The purchaser succeeds, with the assent of the state, to all the rights of the Indians. He stands with respect to this land in their place and claims the benefit of their contract. This contract is certainly impaired by a law, which would annul this essential part of it." Peters, J., in giving the opinion of the court in *Osborne* v. *Humphrey*, before cited, after quoting at some length from the remarks of Judge Marshall in the foregoing case, says:—" In these opinions I entirely concur. The case can not be distinguished from the case before us." Bissell, J., in giving the opinion of the court in *Landon* v. *Litchfield*, before cited, says, (p. 261;)—" It is contended that by the lease to the Rev. Mr. Champion for nine hundred and ninety-nine years, in consideration of his settlement, this lot was diverted from the use to which it was intended, and thereupon became subject to taxation. Unless we are entirely mistaken in the view we have taken of the case of *Osborne* v. *Humphrey*, and entirely misapprehend the grounds of the decision, this precise point was there made and determined. We are unable to distinguish the cases." Again, on page 262, he says, " It is impossible, as we think, to look into the case of *Osborne* v. *Humphrey*, and not to perceive that the decision is based upon the broad principle that the privilege of exemption is attached to the land, and not to the favored title, as it has been termed. It adopted the reasoning, as well as the language, of the supreme court of the United States, in the case of *New Jersey* v. *Wilson*, 7 Cranch, 164. It placed the grant on the ground of a contract between the government and the grantor, that

the land so given or granted should remain exempt from taxation. Whether this principle be correct, and whether that decision be right or wrong, is not now the question." In view of these decisions we will only add in the words of the same judge, when speaking with reference to another point in the same case, " In view of these repeated adjudications, the mind is at a loss to perceive what object is proposed by again agitating the question. Is it that decisions are to be regarded as of no binding authority ?—that nothing is to be considered as settled ?—and that the maxim ' *stare decisis* ' has become too antiquated and time-worn for modern application ? "

ELLSWORTH, J. It was claimed with much earnestness and confidence in the argument that the question involved in the present case has been repeatedly decided by this court. If such was our opinion we should not think it our duty to review these decisions, even if we could not reconcile the principles on which they are placed, or approve of all the *dicta* of the learned judges who gave the opinions. But we do not see that the precise question here presented has ever been decided, and we are not able to deduce from the cases referred to any well defined and settled rule which we can apply to the case, and which will be a satisfactory guide in the inquiry whether the tax imposed upon the property of Mr. Sheffield is constitutional and valid or otherwise.

The cases referred to in our reports are those in which the trusts authorized by the statute of 1702 were held to be still in force under long leases; the present case is one in which the trust has ceased, and the land, relieved of the trust, has reverted to its former condition of common property, a condition in which, as we think, it should share the fate of common property subject to taxation.

The question involved arises under the ancient statute to which reference has just been made. That statute takes away from the legislature for all time the right to tax the land to which it applies, however urgent and imperative may be the necessities of the government, or of its subordinate municipalities,—a very large concession on the part of the government, it

must be admitted.  In such a case it can not be questioned that the grant should be construed with great precision and strictness.  Indeed, this rule of construing public grants is said to be the law in all grants by the sovereign power, more especially where they contain a renunciation of the power to impose taxes, and where the exemption is to endure for all time, and is under all circumstances irrevocable, or liable to be defeated only by the overthrow of the government.  Such a renunciation of sovereignty, more than any other, should, we repeat, be construed with extreme strictness.  This court had occasion recently to examine the rules for construing public grants, in the late case of the *Hartford Bridge Company* v. *The Union Ferry Company,* reported in the 29th volume of Connecticut Reports, p. 210, which involved the question of the extent of a legislative grant.  On that occasion many cases were cited from the English and American reports which carried the rule to a very great extent, some of them declaring that every grant of a public franchise ought to be construed with the strictness of penal statutes.  Whether this is not carrying the doctrine too far, as we there intimated, we have no occasion to decide, for all will agree that there should be great strictness in the construction of such grants, leaving little or nothing to presumption.

In this view then let us consider the statute of 1702.  The chief object in the enactment of that statute was not so much to exempt certain estates from taxation, as to confirm and perpetuate the estates referred to in it, with certain attending privileges.  It declares that " lands, tenements, hereditaments and other estates [given for certain charitable uses,] shall forever remain and be continued to the use or uses to which such lands, tenements, hereditaments, or other estates have been or shall be given or granted, according to the true intent and meaning of the grantors, and to no other use whatever ; " so that, so long as the title should remain in the trustees, that is, so long as the trust should subsist and the estate not be put to any other use, the societies or corporations holding the lands should not be taxed for enjoying them.  But if the parties interested consent to put an end to the trust, or the

grantee, without the consent of the grantor or his heirs, devotes the property to some other use, and the estate is thus thrown into the general mass of property, to pass by deed, devise, levy of execution or·adverse possession, free and unincumbered like any other estate, we are not satisfied that the legislature intended that it should be any longer exempt from taxation, or that the statute requires or fairly admits of such a construction. Nor does the fact that the land will sell for more if it is exempt from taxation materially affect the question. If the buyer will join with the party for whose benefit the property was given, and break up the trust, as we think he does by taking an absolute deed of the fee, knowing the property to be held in trust for certain definite purposes, he can not justly complain that the property can not continue exempt from taxation.

Herein we think is the difference between the present case and those cited from our reports, which have been pressed upon us as having settled the doctrine of the case. In the case of *Atwater* v. *Woodbridge*, 6 Conn., 223, the earliest of the cases, the court decided only that the statute of 1702 extended to personal as well as real estate, by the words "and other estates," and that the statute constitutes a contract between the government and the donor or grantor, according to the terms of the grant, which can not be impaired by reason of the constitution of the United States. And it is most worthy of notice that the fund there held exempt from taxation was made up in part of the avails of land given in trust under the statute and which had been sold, and which by the sale must have been freed from the original trust, or else both the land and the money received for it would have been exempt, which no one will pretend could be the case. Suppose that the land, instead of being sold for money, had been exchanged for other land to be held and used by the society in the place of the former; which we ask would be exempt from taxation? According to the doctrine of that case it would clearly be the land received by the society in exchange, for it was the fund thus received which was held entitled to the exemption. Suppose again, in the present case, that Mr. Sheffield had paid

the consideration ($20,000) in the stock of the New Haven bank, which, the stock or the land, would be exempted? According to the case of *Atwater* v. *Woodbridge* it would be the former. The precise question now made, it is true, was not particularly presented there; other points were more important and prominent, and the consequence in this respect of changing the fund from its original to a new condition seems to have been passed over without special consideration; and we only refer to that case as making more for the plaintiffs, on the whole, than against them. We repeat, we do not controvert the general doctrine of that decision.

The next case in order is that of *Osborne* v. *Humphrey*, 7 Conn., 335, and which has been the subject of more remark from the bench and the profession than almost any other case in our books; but we need not controvert even that decision. It was there claimed by the plaintiff's counsel, that the lease for 999 years was in substance a sale of the fee, and therefore a determination of the trust under the statute of 1702; but the court held otherwise, and that they would not distinguish between a long and a short lease; and further that it was not important whether in leases rent is to be paid annually, or a single consideration paid at one time. Without meaning to express our concurrence in the course of argument adopted in that case, or in the view of the court that the alienation was to be treated as a lease under which the defendant was holding as a tenant, that decision is not decisive of the present case, for the court put the case on the very ground that the conveyance was a lease, and held that the society, the original donee of the charity, was not obliged to occupy the land personally, but might by their tenant or lessee, and that the land was used by the society consistently with the perpetuity of the trust. At any rate the conveyance in that case was not an absolute sale of the fee.

The next case is that of *Parker* v. *Redfield*, 10 Conn., 490. That case is also one of a lease for 999 years. But even there the court give some indication that the doctrine of *Osborne* v. *Humphrey* was regarded as having been carried in some respects to the verge of the law, and they lay hold of the

circumstance that in the case before them a dwelling-house placed upon the land by the lessee was personal property and could be taxed as such. On this ground, they say, there is a distinction between the cases. The same fact however existed in the case of *Osborne* v. *Humphrey*, for there the lessee or his successor had built on the leased premises, and had the same right to remove the buildings as in *Parker* v. *Redfield;* and that very circumstance was pressed upon the court in the former case to induce them to hold that the buildings erected by Humphrey were taxable. To us, it seems difficult to distinguish these cases. But, be that as it may, both are cases of leases and nothing more.

The next case is that of *Landon* v. *Litchfield*, 11 Conn., 251, another case of a lease. The main question there was, whether the trust originally created still remained. The defendants insisted that it did not, but had been determined by the act of the ecclesiastical society itself. The plaintiff on the other hand insisted that the lease to Mr. Champion, his grantor, for 999 years, had not put an end to the trust and the accompanying exemption from taxation, and that such a use of the land as the society had given to Mr. Champion was consonant with the original trust, and could be enjoyed under it. The court decided in favor of the plaintiff's claim; but the question of an absolute sale, and of the determination thereby of the trust created in the original deed to the society, in which the land was given " for the support of the ministry forever," was not necessarily involved. Besides, that decision was not satisfactory to the whole court, either on that point or on some others which were decided.

These are the only cases in our own reports bearing upon the question. The case of the *State of New Jersey* v. *Wilson*, reported in 7 Cranch, 164, and which has been referred to in the argument, is merely, as is declared by Ch. J. Marshall, the case of a treaty exemption of land from taxation, which land had been exchanged for other land by the Indians. The land received by them was in no sense to be held in trust, but was ceded to them to be enjoyed absolutely and forever for all purposes, free from taxation. This exemption was a part

of the grant itself. Of course the Indians had a right to alienate their lands just as they held them themselves. We do not regard this decision as having any important application to the present case.

On the whole we are of opinion that the tax was legally laid upon the land in question, and that the plaintiffs are entitled to judgment.

In this opinion the other judges concurred.