The opinion of the court was delivered by
Brewer, J.;
The facts in this case are these: The defendant in error, being the owner in fee simple of a large tract of land situate in Miami county, purchased by him from reservees under the Treaty of June 5th, 1854, between the govern *115 ment .of the United States and the Miami tribe of Indians, commenced his action in the district court for Miami county to restrain the defendants from levying or collecting taxes thereon, and to restrain the defendant Coonrod from receiving tax deeds from the county clerk, he the said Coonrod being the owner and holder of pretended certificates of tax sale on said lands. The defendant in error claims that under the first article of said treaty the said lands are exempted from taxation, a clause in the first article providing that the lands patented to the reservees shall not be subject to levy, sale, execution or forfeiture. In the court below the plaintiffs in error interposed a general demurrer to the petition, and at the same time moved to dissolve the temporary injunction that had been granted the defendant in error at the commencement of the action. The court overruled the demurrer, and refused to dissolve the injunction, to which ruling exceptions were noted, and the case is here for' review. The errors alleged are, the action of the court in overruling the demurrer, and in refusing to dissolve the injunction, and they severally present the naked question as to whether or not the lands in question are taxablé'under thé laws of the state of Kansas, in the hands of the defendant in error.
I. The solution of the first question depends entirely upon the provisions of said treaty of June 5th, 1854. (10 U. S. Stat. at Large, 1092.) For, unless exempted by virtue of that treaty, they are taxable under the first section of the tax law, which declares that all property in this state, real and personal, not expressly exempted therefrom, shall be subject to taxation. (Gen. Stat., 1019, ch. 107, § 1.) That these lands, while they remained the property of the reservees, under the .treaty, were exempt, is settled by the decision of the supreme court of the U. S. in the case of the Miamis, 5 Wall., 760, reversing the judgment of this court, 3 Kas., 364. Did this exemption attach to the land, qualifying the estate, and inuring to the benefit of all subsequent holders of the title, or was it simply a personal privilege of the Indian owners? As preliminary to this inquiry, and assisting to a clear under *116 standing and correct decision, it may be well to -determine the nature and extent of the exemption which, if any now exists, was created by the treaty.
The special clause which is claimed to create the exemption recites'that “the lands so patented shall not be liable to levy, sale, execution, or forfeiture.” These words were construed by this court, in the case in 3 Kas., as referring simply to judicial proceedings; but the supreme court of the U. S. said that “such construction would be an' exceedingly narrow one, whereas enlarged rules of construction are adopted in reference to Indian treaties,” and decided that tax levies and sales were also prohibited by them. It appears therefore settled that the exemption is from seizure and sale under both judicial and tax proceedings. It would seem probable also, that a like rule of construction would extend the word “sale” to voluntary as well as forced sales, and that in the absence of all other legislation and restriction the Indian owner would thereby be restrained from a voluntary sale of his real estate. But it is unnecessary to determine this point, or press the suggestion. It is enough to keep within the limits of past decisions. The land is exempt from seizure and sale, whether for nonpayment of taxes, under an ordinary judgment, on a foreclosure of a mortgage, or in partition. That the parties to this treaty might well contemplate attaching such an exemption to the land, so long as it remained the property of its Indian owner, is obvious. It is in harmony with the whole spirit of the dealings of the government with the Indians. Its aim is to protect him in the enjoyment of his property, to secure him in its undisturbed possession, notwithstanding his ignorance, and in spite of the rapacity of his more intelligent white neighbors. Such an exemption is but significant of and in harmony with that purpose. But that the government should contemplate attaching this as a permanent exemption to the land, running with it long after it should pass out of the hands of the Indians who alone were sought to be protected, and placing a large body of land within the borders of Kansas, owned by her citizens, yet *117 beyond the reach of her laws, is hard to believe. Counsel, whose superior abilities and long experience give to his opinions great weight,* strenuously contends that the government has not the power to attach such an exemption and says:
“The constitution of the United States gives to congress the power to dispose of and make all needful rules and regulations respecting the territory and other property of the United States. But under this provision of the constitution congress would have no power to dispose of the public lands in such a way that they would be exempt from state taxation after the government had disposed of them to individuals, and parted, with all control over them. We are not aware that the United States have claimed or attempted to exercise such a power. It is not a power expressly granted, nor is it a power necessary to be exercised in order to carry into effect any of the expressly delegated powers. The government can dispose of the public lands without exempting them in the hands of its vendees from state taxation. If this power exists, it is a power that might deprive the néw states of all revenue from real estate, and thus leave them without the means of supporting the state governments. No government can exist without revenue; there can be no revenue without taxation, and there can be no taxation without property. We claim, then, that the federal government under the constitution of the United States, has no power to dispose of the public lands, or to assent to the disposal of them to individuals in fee simple in such a way as to deprive the state of the exercise of its sovereign right to tax them. So long as the lands remain Indian lands, or so long as the government retains an iñterest in, or control over them, the state, by compact in the act of admission, is prohibited from exercising the taxing power in relation to them. But the moment the .title passes out of the government, and is vested in individuals, the lands become subject to all the laws of the jurisdiction where they are located.”
Certainly, if such a power exists, the purpose to exercise it will not be imputed to congress unless plainly demanded by the language they have used. At the time of this treaty the Miamis were in possession of about 500,000 acres in the eastern borders of the present state of Kansas, which they held by the ordinary Indian title, viz., a fee simple, but *118 without the power of alienation, except by the consent of the government. By the first article of the treaty they cede to the U. S. all but 70,640 acres. It will be noticed that this was not a cession of the entire tract, and a retrocession of the 70,640 acres, but a simple cession of all except the part reserved. If this were the only • article, the lands reserved, which include the lands in controversy, would without any question have been held by the same title as theretofore, to-wit, the ordinary Indian title; and when that title passed out of the Indians into the hands of white men the land would have been subject to taxation and judicial process. By the 2d article of said treaty it is provided that the United States shall, as soon as it can conveniently be done, cause the lands herein ceded and reserved, to be surveyed as the government lands are surveyed, the Miamis bearing the expense of survey of the reserved land. And said article then provides that within four months after the approval of such survey, each individual or head of a family of the Miami tribe now residing on said land shall select, if a single person, two hundred acres, and if the head of a family, a quantity equal to two hundred acres for each member of the family. This article provides the way in which the head-right selections shall be made; provides for absentees, and also that the chiefs shall select 640 acres (thereinbefore reserved) for their schools: and after. all the head-right selections are made, and the school section selected by the chiefs, it is further provided, that the chiefs shall further proceed to select in a compact body, and contiguous to the individual reservations, the residue of the seventy thousand acres exeepted and reserved by the preceding article; which body of land shall be held as the common property of the tribe, etc. This article also among other things provides, that “all selections herein provided for, shall, as far as practicable be made in conformity with the legal subdivisions of the United States lands, and- reported immediately to the agent of the tribe, with apt descriptions of the same; and the president may cause patents to issue to single persons, or heads of families, *119 for the land selected by or for them, subject to such restrictions respecting leases and alienation as the president or congress of the United States may impose; and the land so patented shall not be liable to levy, sale, execution or forfeiture; provided, that the legislature of a state within which the ceded country may be hereafter embraced, may, with the assent of congress, remove these restrictions.” The third article of this treaty provides that “in consideration of the cession hereinbefore made, the United States agree to pay the Miami tribe of Indians the sum of $200,000, in manner as follows;” it then provides for thepayment of the above sum in installments, and the investment of a portion thereof by the president, etc. The above recited provisions of the treaty of 1854. are all the parts of said treaty that have á direct and material bearing on the question before the court.
It is earnestly insisted that the case of The State of New Jersey v. Wilson, 7 Cranch, 164, is decisive of this question. That case decides that a contract by a state to exempt certain lands from taxation is binding on the state, and cannot by it be broken, and the exemption withdrawn. The facts in that case were briefly these: In 1758 (before the adoption of the federal constitution,) a portion of the Delaware Indians who claimed a large body of lands in the colony of New Jersey, and who desired to join their friends in New York, entered into an agreement with the then colony of New Jersey, whereby it was stipulated that the Indians should surrender to the said colony, said lands, and in consideration of the same they were to receive in lieu thereof a body of lands south of the river Rariton, which were purchased for said Indians. And it was further provided “that the lands to be purchased for the Indians aforesaid shall not hereafter be subject to any tax, any levy, usage or custom to the contrary thereof in any wise notwithstanding.” Afterward these Indians procured the enactment of a law allowing them to sell these lands, without any provision in the act in reference to their being taxable. Under this act the lands were sold to white men. And afterward, and .while such lands were held *120 and owned by white men, the legislature attempted to repeal the law of 1758, exempting the land from, taxes. And the same were assessed, and taxes sought to be collected on the same. A suit was instituted to test the validity of said repealing act, and on appeal to the supreme court of the United States, that court held that said act was unconstitutional and void, and that the exemption ran with the land. Chief Justice Marshall, who delivered the opinion of the court, said: “ The privilege, though for the benefit of the Indians, is annexed by the terms which create it to the land itself, not to •their persons. It is for their advantage that it should be annexed to the land, because in the event of sale, on which alone the question could become material, the value would be enhanced by it.” Thus, there was an express contract by the state that the lands should not thereafter be taxable, a grant of certain non-taxable lands in purchase of other property. The exemption increased the value of the consideration, was itself a part of the consideration. Here, the state is no party to the contract. That was inter alios partes. Nor does the exemption appear as a part of the consideration. The only consideration the United States received from the Miami Indians was the cession of land mentioned in the first 'article. By that the government received from the Miamis 430,000 acres of land. As a full consideration for that cession, the government, by the third article of the treaty, agreed to pay, and the Miamis agreed to receive, $200,000. This sum, by the express contract of the parties, is in full payment for the land ceded, and the land is all that the government received from the Indians. To say then, that this exemption-clause in the treaty, and $200,000, was the consideration given by the government for this 430,000 acres of land, is not construing, but adding to the treaty. The treaty shows on its face that the government received no consideration for this exemption-clause in the second article of the treaty. The treaty is twofold in its nature and purpose; it is a purchase of 430,000 acres of land for $200,000; and also, an arrangement for the partition among the individual members of *121 70,000 acres hitherto held by the tribe in common. These two elements are not only distinct in their natures, but are kept separate in the treaty, being provided for in different articles of the treaty. They are as distinct as though accomplished by two separate treaties.- But it may be said that this is too narrow and contracted a view to take of this treaty, that those enlarged rules of construction which obtain in respect to Indian treaties require that every provision in the treaty which in any manner inures to the benefit of the Indians shall be deemed as part of the consideration of the cession, and therefore inviolate, as a contract obligation; or, it may be claimed that a treaty is itself a contract, and all its stipulations contract obligations, and inviolate by state legislation. Conceding this- claim in its fullest scope, and it only brings up the question of the extent of this stipulation. What did the parties to this treaty contemplate, when they inserted this provision? “The object of the treaty,” say the U. S. supreme court, “was to hedge the lands around with guards and restrictions so as to preserve them for the permanent homes of the Indians. In order to accomplish this object, they must be relieved from every species of levy, sale, and forfeiture, from a levy and sale for taxes as well as the ordinary judicial levy and sale.” The purpose was not to enhance the value of .this property, but to preserve it to them. Tl^at purpose was effectually accomplished by the two provisions which stand side by side, one restricting leases and alienations, and the other exempting from seizure and sale. Neither should be carried further than is necessary to accomplish the purpose of the parties. When they stipulated that patents for the land might issue “subject to such restrictions respecting leases and alienations as the president or congress of the U. S. may provide,” they contemplated restrictions simply on the Indian owners, and not on subsequent white purchasers. ' It was not thought that, after the title had passed from the Indians to the whites, there should be any restriction or limit to the latter’s power of sale or lease. And if the restriction was not to be carried beyond the period of Indian ownership, why *122 should the exemption be? The two provisions are parallel; they stand side by side, and are each general in their terms. They should be construed similarly, and with reference to the obvious intent of the contracting parties.
The case of Armstrong v. The Treasurer of Athens County, reported in 10 Ohio, 235, is very much in point. In 1804, two townships of land were vested in the Ohio University for the sole use, benefit, and support of the university forever. The same act declared that the land in the two townships appropriated and vested as aforesaid, with the buildings which were or might be erected thereon, should forever be exempt from all state taxes. In 1826, the legislature authorized the trustees of the university to sell and convey in fee simple the land in said two townships. In pursuance to this statute the trustees sold the land, and the complainants became the purchasers from the trustees, and claimed to hold them exempt from state taxation. The supreme court of Ohio decided that the land was not exempt, a decison which was affirmed by the supreme court of the U. S. (16 Peters, 281.) In that case the land was declared by the act to be forever exempt. But the court say that this clause in the law must be taken in connection with other parts of the same relative to these lands; and when taken in this connection it seemed clear that it was not the intention of the legislature that the exemption should continue for any longer period than for the time the land should be vested in the corporation in trust for the purposes in the act specified. So in this case, in construing the Miami treaty, we must look at all its provisions, and determine the object the parties had in view. When we take this exemption-clause in connection with the other provisions of the treaty, it seems that it was not the intention of the parties that the exemption should continue for a longer' time than was necessary to protect the Indians in the use and occupancy of their homes. That when the lands should cease to be the homes of the Indians, and they had no further claim to the same, and the title to the land had become vested in fee simple in individuals, with the con *123 sent of the government, the object of the exemption, and consequently the exemption itself, ceased.
This question of exemption from taxation is further discussed in the cases of the Town of New Haven v. Sheffield, 30 Conn., 160; Brainard v. Town of Colchester, 31 Conn., 407; Lord v. Town of Litchfield, 10 Am. Law Register, 493. In the notes of Judge Redfield to this last case, on page 505 of the Register, he says that in the case of Brainard v. The Town of Colchester, above cited, the court makes “the true distinction upon this point of exemption of property from taxation — 1st, that it should receive a-strict construction, and not be extended further than the fair import of the words require; 2d, that when the exemption.is based upon the use to which the estate is conveyed, it shall not be construed as attaching to the land beyond the time of its appropriation to that use; 3d, that to attach a perpetual exemption of lands, or real estate, from taxation, it must form one of the elements of a contract or grant on the part of the state.”
The case before us seems to us to come fairly within the second rule laid down. The exemption was based upon the use by the Indians, and when that use ceased the exemption also ceased. The judgment of the district court will therefore be reversed, and the case remanded for further proceedings in accordance with the views herein expressed.
All the Justices concurring.

[*Hon. Wilson Shannon, of Lawrence.]