SCHOCK, *Okmulgee County Treasurer, et al.* v. SWEET *et al.*

No. 6410. Opinion Filed December 15, 1914.

(145 Pac. 388.)

1. TAXATION—Property Subject—Allotment—Purchase. The town lots involved were a part of the homestead allotment of a Creek freedman, which allotment, under section 16 of the Allotment Act (32 Stat. 503, c. 1323), was to be inalienable and non-taxable for a period of twenty-one years from date of issuance of patent. The act of Congress of March 3, 1903 (32 Stat. 996, c. 992), provides: "And provided further, that nothing herein contained shall prevent the survey and platting, at their own expense, of town sites by private parties where stations are located along the lines of railroads, nor the unrestricted alienation of lands for such purposes, when recommended by the Commission to the Five Civilized Tribes and approved by the Secretary of the Interior." Under this law, the allottee made application to the Secretary of the Interior and caused the restrictions upon alienation of said land to be removed. At the date of the removal of said restrictions, section 19 of the act of Congress of April 26, 1906 (34 Stat. 144, c. 1876), was in force, which section provides: "That all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the allottee." The land was platted into lots and blocks, and plaintiffs thereafter purchased said lots. Defendants placed same on the tax rolls, and assessed said property for taxation against plaintiffs. Plaintiffs filed their petition with the County Commissioners, demanding that said lots be stricken from the tax rolls. Said petition was denied. Upon appeal to the district court, judg-

ment was rendered for plaintiffs, restraining the collection of taxes on said property. Held error, for the reason said property was not exempt from taxation after title passed from the allottee to plaintiffs.

2.   SAME—Exemption—Allotments. Plaintiffs obtained title to the property involved through and by virtue of the provisions of the act of Congress of March 3, 1903, supra. They now seek to have exempted from taxation said property. Held, that except by virtue of the provision of the act of Congress of March 3, 1903, supra, plaintiffs could not have secured title to said property; that said act nowhere attempts to exempt said property from taxation; that the use to which said property has been appropriated is inconsistent with continuing the exemption from taxation. Therefore said property is subject to taxes.

(Syllabus by the Court.)

*Error from District Court, Okmulgee County;*

*Wade S. Stanfield, Judge.*

Action by Cornelia Sweet and others against Elmer E. Schock, Treasurer of Okmulgee County, and the board of County Commissioners of Okmulgee County. Judgment for plaintiffs, and defendants bring error. Reversed, with directions to render judgment for defendants.

*Orlando Swain* and *J. W. Childers,* for plaintiff in error.

*Merwine, Newhouse & Albertson,* for defendants in error.

RIDDLE, J. Defendants in error will be denominated the plaintiffs, and the plaintiffs in error the defendants. Plaintiffs are owners of certain lots in what is known as the Capital Heights addition, Nos. 1 and 2, in the city of Okmulgee, being the same lots referred to in the agreed statement. These lots were part of the homestead allotment of Sarah Smith, a Creek freedwoman. The lots were assessed and placed on the tax rolls by the authorities of Okmulgee county for the year 1912. Plaintiffs filed their petition with the board of county commissioners in November, 1912, praying that said property be stricken from the tax list. Upon hearing said petition, the prayer was denied, and plaintiffs appealed to the district court. In the district court the cause was heard

upon an agreed statement of facts. That part of said agreed statement material here is as follows:

"(1)   That on the 23d day of April, 1904, the Creek Nation of Indians, by P. Porter, its principal chief, by deed of conveyance or patent, conveyed unto one. Sarah Smith, a freedman citizen of said nation, who had been placed on the final rolls of the citizens and freedmen of said nation, the following described real estate, situated in the city of Okmulgee, Okmulgee county, state of Oklahoma, to wit:  Lot three (3) of section seven (7), township thirteen (13) north, range thirteen (13) east, containing 41.82 acres, more or less.   *   *   *

"(2)   That said real estate was conveyed to the said Sarah Smith as and for her homestead, and was so designated in said conveyance, and said conveyance, at the time of its execution and delivery, contained the express provision that said real estate described in said deed should be nontaxable for 21 years from the date of said deed.

"(3)   That thereafter, on the 28th day of February, 1907, the restrictions on the alienation of said real estate having been removed by the Secretary of the Interior, upon the application and petition of Sarah Smith (as alleged in the defendant's answer, and set forth in the second cause of defense, contained in the amended answer of the defendant), the said Sarah Smith, by deed of general warranty, conveyed fee-simple title to one Nathan Boyd of the following of the above described real estate:   *   *   *   And that said deed was filed for record with the register of deeds of Okmulgee county, Okla., and was by him duly recorded in the proper records of his office.   It is further agreed that, at the time of said conveyance to the said Nathan D. Boyd of the lands above described, there were no improvements thereon, and that said deed contained no stipulation, reservation, or agreement that said land should be exempt from taxation.

"(4)   That on the 1st day of May, 1907, the said Nathan Boyd, being the owner of said real estate last described, caused said lands to be surveyed, platted, and laid out into lots, blocks, streets, and alleys, all according to law, and filed said plat for record; designating the same as the Capital Heights addition to the city of Okmulgee, Okla., which said plat was duly accepted by the proper authorities for said city of Okmulgee, Okla., and said addi-

tion is now a part of and within the incorporated boundaries of said city of Okmulgee, Okla., and the same lies entirely within the lands so conveyed by the Creek Nation to the said Sarah Smith, as and for her homestead.

"(5)   That the said Sarah Smith, after July 26, 1908, having conveyed a portion of her homestead to the said Nathan Boyd, as above set out, caused the remaining portions of said real estate in her said homestead, as aforesaid, to be surveyed, platted, and laid out into lots, blocks, streets, and alleys, all according to law, and the same was duly filed for record with the register of deeds of Okmulgee county, Okla., and said addition was designated as Capital Heights addition to the city of Okmulgee, Okla., and said Capital Heights second addition to said city of Okmulgee, Okla., is now a part of said city, and lies entirely within the incorporated limits of said city.

"(6) That each of the lots in each of said additions, numbered, designated, and tabulated below in this paragraph set out, have been placed by the assessor for said Okmulgee county, Okla., upon the tax duplicate of said Okmulgee county, Okla., and upon the tax duplicate of said city of Okmulgee, Okla., for taxation for the year 1912, for the valuations hereafter set forth, and a tax levied on each of said lots, as is set forth below, with the names of the owners, the valuation for taxation, the amount of the taxes charged for the year 1912, in Capital Heights addition No. 2 to said city.   *   *   *"

The court, on the 2d day of February, 1914, rendered judgment reversing the order of the county commissioners and directing that the property be stricken from the tax rolls, and enjoined defendant Schock, treasurer of said county, his successors in office, from taking any steps toward the collection of any taxes, and from selling any of said property described in said proceeding. From this judgment, defendants prosecute this appeal by filing their petition in error with original case-made attached.

The assignments of error necessary to be considered are:   (1) The court erred in not rendering judgment for plaintiffs in error upon the agreed statement of facts submitted to the court as the evidence in the case.   (2) The judgment and decree is not sus-

tained by the evidence and is contrary to the evidence.    (3) Said judgment and decree is contrary to law.

This record presents but one question for our determination, which is:  Were the lots belonging to plaintiffs, which were originally parts of the homestead allotment of Sarah Smith, a Creek freedman, exempt from taxation in the hands of plaintiffs?  This question involves the consideration of section 16 of the Supplemental Creek Agreement (32 Stat. 503), commonly known as the Allotment Act, under which said lands were allotted to Sarah Smith, together with the provision of the Indian Appropriation Act, herein referred to, and the act of April 26, 1906.  Section 16 of the Creek Supplemental Agreement reads:

"Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior.  Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefore, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear."

It is the contention of plaintiffs that, under this provision of the treaty, the exemption attaches to and runs with the lands in the hands of plaintiffs, who purchased from the original allottee. On the other hand, defendants contend that said exemption was intended only for the benefit of and as a personal protection to the allottees, and did not attach to and become appurtenant to the land; hence did not pass to plaintiffs.  Defendants claim the authority and right to tax said property under section 19 of act of Congress of April 26, 1906, which in part provides:

"That all lands upon which restrictions are removed shall be

subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee."

It is well to keep in mind the manner in which the restrictions upon alienation of this land were removed, and the authority of said Sarah Smith to place this land upon the market, and the source of plaintiffs' title. The Indian Appropriation Bill of March 3, 1903 (32 Stat. p. 996, c. 992) contains the following provision:

"And provided further, that nothing herein contained shall prevent the survey and platting, at their own expense, of town sites by private parties where stations are located along the lines of railroads, nor the unrestricted alienation of lands for such purposes, when recommended by the Commission to the Five Civilized Tribes and approved by the Secretary of the Interior."

Sarah Smith made application to the Secretary of the Interior under this provision of the law, and she was specifically authorized to convey the land for town-site purposes, as was done in this case. It is well to remember that the state of Oklahoma, as a sovereign, has plenary power to subject all property within her domain to taxation, except such property as may have been exempted by the Enabling Act, or unless restrained by the federal Constitution. If this property is not subject to the taxing power of the state, it must be by reason of some specific provision exempting it from taxation by a federal law or treaty with the Indian tribes, which provision the state has agreed to keep inviolate, or else is exempt by some provision in the Constitution. Section 1 of the Enabling Act provides:

"Provided, that nothing contained in the said Constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this act had never been passed."

Section 22 of said act provides:

"That the constitutional convention provided for herein shall, by ordinance irrevocable, accept the terms and conditions of this act."

Article 10, sec. 6, of the Constitution, after naming certain property exempt from taxation, provides:

"And such property as may be exempt by reason of treaty stipulations, existing between the Indians and the United States government, or by federal laws, during the force and effect of such treaties or federal laws."

The Enabling Act requires the state, through its constitutional convention, to adopt the Constitution of the United States, which was done by article 25, sec. 44, of said document; and it also provided that the people, through said convention, should irrevocably adopt the Enabling Act, which was done by article 25, sec. 45, Const.

Plaintiffs rely, principally, to sustain their contention upon the cases of *Choate v. Trapp,* 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941, *English v. Richardson,* 224 U. S. 680, 32 Sup. Ct. 571, 56 L. Ed. 949, and *State v. Wilson,* 7 Cranch, 164, 3 L. Ed. 303. The case of *English v. Richardson, supra,* involves the exemption under the Creek treaty. The court, in substance, in *Choate v. Trapp, supra,* announced that the exemption from taxation provided for in the Chickasaw and Choctaw agreement was a property right, which Congress could not abrogate. The court, in the opinion, said:

The right to remove the restriction was in pursuance of the power under which Congress could legislate as to the status of the ward and lengthen or shorten the period of disability. But the provision that the land should be non-taxable was a property right, which Congress undoubtedly had the power to grant. That rightfully vested in the Indians and was binding upon Oklahoma."

In considering the purpose and effect of the agreements be-

tween the government and these different tribes of Indians, and their effect upon the state, we must not lose sight of the fact that the state is bound only by such agreements wherein it specifically consented to be bound; and except where it expressly agreed to exempt Indian property from taxation, the right to tax remains unimpaired. The Supreme Court, in *Choate v. Trapp, supra,* held that the exemption from taxation for a certain period constituted a property right, which the federal government could not withdraw or abrogate; and it necessarily follows that the state was bound by such exemption by virtue of accepting the Enabling Act, and by virtue of the provision contained in section 6, art. 10, of the Constitution, wherein it specifically agreed to exempt such property as may be exempt by reason of treaty stipulations existing between the Indians and the United States Government, or by federal laws while such provisions are in force and effect. We find in the agreement involved in the case of *Choate v. Trapp, supra,* a provision exempting from taxation lands granted by the federal government, which exemption the federal Supreme Court holds was a property right, and a right that Congress could not destroy. Certainly, under this construction of the federal law, this provision was in force and effect, and the state, by its Constitution, expressly agreed to exempt such property from taxation, so long as that provision remained in force and effect.

So it will be seen that the decision in *Choate v. Trapp, supra,* could not have reasonably been otherwise. But here we have an entirely different question; we are dealing with a different class of citizens, and one that is entitled to no protection, save and except that protection which every other citizen of the United States is entitled to receive. The provision as applied to these citizens must be strictly construed against granting the tax exemption; and, if we fail to find it granted in specific terms and expressed in language about which there can be no doubt, the exemption does not exist. In other words, an exemption from taxation is never presumed; but in all cases of doubt as to the legislative intent, except where the rights of Indians are involved. the pre-

sumption is in favor of the taxing power.  *Allen v. Trimmer, post,* 144 Pac. 795; *Wells v. Savannah,* 181 U. S. 531, 21 Sup. Ct. 697, 45 L. Ed. 986; *Tucker v. Ferguson,* 22 Wall. 527, 22 L. Ed. 805; *Delaware Railroad Tax Case,* 18 Wall. 206, 21 L. Ed. 888; *Hoge v. Railway Co.,* 99 U. S. 348, 25 L. Ed. 303; *Vicksburg R. R. Co. v. Dennis,* 116 U. S. 665, 6 Sup. Ct. 625, 29 L. Ed. 770; *Pickard v. East Tennessee R. Co.,* 130 U. S. 637, 9 Sup. Ct. 640, 32 L. Ed. 1051; *Wilmington, etc., R. R. Co. v. Alsbrook,* 146 U. S. 279, 13 Sup. Ct. 72, 36 L. Ed. 972.

On the other hand, from the foundation of our government, acts of Congress and agreements between the various Indian tribes have always been construed liberally in favor of the Indians.  This rule applies to laws relating to taxes.  It was said in the case of *Tiger v. Western Inv. Co.,* 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738:

"We must remember, in considering this subject, that the Congress of the United States has undertaken from the earliest history of the government to deal with the Indians as dependent people and to legislate concerning their property with a view to their protection as such.  *Cherokee Nation v. Georgia,* 5 Peters, 1, 17 [8 L. Ed. 25] ; *Elk v. Wilkins,* 112 U. S. 94, 99 [5 Sup. Ct. 41, 28 L. Ed. 643] ; *Stephens v. Cherokee Nation,* 174 U. S. 445, 484 [19 Sup. Ct. 722, 43 L. Ed. 1041]."

The general rule, as stated in 37 Cyc. 897, is as follows:

"Exemption from taxation granted by the Legislature to an individual or a corporation is not a franchise, nor is it an estate or interest inherent in or running with the particular property exempted; but it is a mere privilege personal to the grantee; and, unless there is express statutory authority therefor, the exemption will not pass to a successor of the corporation or to a person taking the property by sale, assignment, or by other transfer.  So, in construing grants of exemption, they will be construed as personal and limited to the grantee, unless a contrary intention clearly appears."

Cases sustaining this text are cited from many of the states,

and also from the United States Supreme Court, as follows: *Rochester R. Co. v. Rochester,* 205 U. S. 236, 27 Sup. Ct. 469, 51 L. Ed. 784; *Home Ins. Co. v. Tennessee,* 161 U. S. 200, 16 Sup. Ct. 476, 40 L. Ed. 670; *Phoenix F. & M. Ins. Co. v. Tennessee,* 161 U. S. 174, 16 Sup. Ct. 471, 40 L. Ed. 660; *Mercantile Bank v. Tennessee,* 161 U. S. 161, 16 Sup. Ct. 461, 40 L. Ed. 656; *Pickard v. East Tennessee R. Co.,* 130 U. S. 637, 9 Sup. Ct. 640, 32 L. Ed. 1051; *Chicago, etc., R. Co. v. Missouri,* 122 U. S. 561, 7 Sup. Ct. 1300, 30 L. Ed. 1135; *Chesapeake, etc., R. Co. v. Miller,* 114 U. S. 176, 5 Sup. Ct. 813, 29 L. Ed. 121; *Memphis, etc., R. Co. v. Berry,* 112 U. S. 609, 5 Sup. Ct. 299, 28 L. Ed. 837; *Louisville, etc., R. Co. v. Palmes,* 109 U. S. 244, 3 Sup. Ct. 193, 27 L. Ed. 922; *Morgan v. Louisiana,* 93 U. S. 217, 23 L. Ed. 860; *Armstrong v. Athens County,* 16 Pet. 281, 10 L. Ed. 965.

There is no doubt that the primary purpose of the provision of the treaty exempting the homesteads of the members of the Creek Tribe of Indians from taxation for 21 years was for the sole benefit and protection of those Indians. Out of the 160 acres of land conveyed to each member of said tribe, it was thought wise by the government that each allottee should retain at least 40 acres as a homestead for a period of at least 21 years, or during such part of said period as such allottee might live; and the government in carrying out this policy, undertook to throw such restrictions and safeguards around each allottee as would protect him in the possession and title of his homestead for that period of time. Thus, in addition to prohibiting the alienation of the homestead for a period of 21 years, exemption from taxation was likewise granted for the same period and for the same purpose. This is made clear by Mr. Justice Brewer in the case of *Goudy v. Meath,* 203 U. S. 146, 27 Sup. Ct. 48, 51 L. Ed. 130, where it was said:

"That Congress may grant the power of voluntary sale, while withholding the land from taxation or forced alienation, may be conceded. * * * But, while Congress may make such provision, its intent to do so should be clearly manifested, for the purpose of the restriction upon voluntary alienation is protection of the

Indian from the cunning and rapacity of his white neighbors, and it would seem strange to withdraw this protection and permit the Indian to dispose of his lands as he pleases, while at the same time releasing it from taxation."

Congress recognized the fact that the power in the state to tax necessarily carried with it the power to destroy, and to enforce a payment of such tax by sale of the property, should it become necessary; and no doubt this was one reason for granting the tax exemption. This reason is not in conflict with the holding of the Supreme Court in the case of *Choate v. Trapp, supra.* The fact that Congress has placed this additional safeguard around the members of the Creek Tribe of Indians is not inconsistent with holding that this exemption constituted a property right in the Indian. On the other hand, Congress could have had no purpose in protecting this property from taxation in the hands of speculators or other noncitizens of the tribes. It would have been an unjust, unnatural, and unwarranted discrimination, which the federal government has always studiously refrained from making. Congress required the state to provide that the property of nonresidents should not be taxed at a higher rate than the property of the residents of the state, and certainly Congress did not intend that the state should exempt the property of part of its citizens from taxation, when property of the same class of citizens similarly situated is taxed. In the case of *Commissioners of Miami County v. Breckenridge,* 12 Kan. 114, Mr. Justice Brewer stated:

" 'The object of the treaty,' say the United States Supreme Court, 'was to hedge the lands around with guards and restrictions so as to preserve them for the permanent homes of the Indians. In order to accomplish this object, they must be relieved from every species of levy, sale, and forfeiture, from a levy and sale for taxes, as well as the ordinary judicial levy and sale.' * * * That purpose was effectually accomplished by the two provisions which stand side by side, one restricting leases and alienations, and the other exempting from seizure and sale. Neither should be carried further than is necessary to accomplish the purpose of the parties. When they stipulated that patents for the land might

issue, 'subject to such restrictions respecting leases and alienations as the President or Congress of the United States may provide,' they contemplated restrictions simply on the Indian owners, and not on subsequent white purchasers. It was not thought that, after the title had passed from the Indians to the whites, there should be any restrictions or limit to the latter's power of sale or lease. And, if the restriction was not to be carried beyond the period of Indian ownership, why 'should the exemption be?' The two provisions are parallel; they stand side by side, and are each general in their terms. They should be construed similarly, and with reference to the obvious intent of contracting parties."

Under the Constitution, the state would be unauthorized to exempt this land from taxation, should it undertake to do so. Section 5 of article 10 of the Constitution provides:

"The power of taxation shall never be surrendered, suspended, or contracted away. Taxes shall be uniform upon the same class of subjects."

The Constitution of Minnesota contains a similar provision, and it is said by the Supreme Court of the United States, in the case of *Great Northern R. Co. v. Minnesota*, 216 U. S. 206, 30 Sup. Ct. 344, 54 L. Ed. 446:

"Now, when that purchase was made, the Territory had become a state, with a constitution expressly requiring the equal and uniform taxation of all real and personal property in the state upon a cash basis, and authorized the exemption from taxation of certain specified kinds of property, devoted to public and charitable uses; but, as we have seen, railroad property was not included among the properties that could be so exempted. It is therefore to be taken that the Constitution of the state, after it went into operation in 1858, required all railroads to be taxed by an equal and uniform rule and on a cash basis. The state, having, by its purchase, become reinvested in 1860 with all the rights, franchises, and privileges granted to the Minnesota & Pacific Railroad in 1857, could, speaking generally, have disposed of such interests at will, but clearly it could not have disposed of the interests, acquired by its purchase, in any manner that was inconsistent with, or which would have rendered nugatory, the requirements or injunctions of the state Constitution. * * * The Legislature of

the state could not, after the state Constitution went into operation, have reinvested the old railroad company with such property, rights, immunities, or franchises, or have transferred them to a new corporation or to a consolidated railroad corporation created by the union of prior corporations, accompanied by an exemption from taxation that was inconsistent with the Constitution.   *   *   * It was not competent for the Legislature, after the state Constitution went into operation, to agree, for the state, that the payment of any given per cent. of the gross earnings of the railroad corporation should be in lieu of all other taxation."

See *Trask v. Maguire,* 18 Wall. 409, 21 L. Ed. 938; *Morgan v. Louisiana,* 93 U. S. 217, 23 L. Ed. 860; *Louisiana & N. R. Co. v. Palmes,* 109 U. S. 244, 3 Sup. Ct. 193, 27 L. Ed. 922; *Railroad Co. v. Georgia,* 98 U. S. 359, 25 L. Ed. 185; *Keokuk & Western R. Co. v. Missouri,* 152 U. S. 301, 14 Sup. Ct. 592, 38 L. Ed. 450.

Thus it will be seen there is no provision in the federal laws or any agreement made with the Indian tribes requiring the state to exempt this property from taxation in its present condition. Neither has the state anywhere agreed to exempt it from taxation. On the other hand, the Constitution requires that this property be taxed uniformly with all other property of its citizens subject to taxation.   The purpose for which the exemption was made has ceased to exist, and the exemption itself must fall.   In construing all laws, it is the cardinal rule to ascertain the intent of the lawmakers.   There is nothing in this provision of the agreement, or in any prior or subsequent act of Congress dealing with these Indian tribes, that evidences a purpose in Congress to grant an exemption from taxation of the property in question in the hands of third parties, who are not members of said Indian tribes.   On the contrary, the provision of the act of April 26, 1906, expressly provides that the homesteads shall be nontaxable so long as the title remains in the allottee, which is equivalent to saying that, when the title passes out of such allottee, the land shall be subject to taxation.   Conclusive evidence that it was not the intention of congress. to exempt this class of property from taxation when title and possession had passed from the allottee is found in sec-

tion 30, subd. 24, of act of Congress of June 28, 1898 (30 Stat. 517, c. 517,) commonly known as the Curtis Bill, which section provides:

"No tax shall be assessed by any town government against any town lot unsold by the commission, and no tax levied against a lot sold as herein provided shall constitute a lien on same till the purchase price thereof has been fully paid" to the nation.

The case of *State v. Wilson,* 7 Cranch, 164, 3 L. Ed. 303, is relied upon as authority for sustaining the contention of plaintiffs. We are of the opinion, however, that this case has no application to the facts in the instant case. In that case the state was a party to the agreement and granted the exemption, and, as was held, for a valuable consideration, and in every respect constituted a valid contract which could not be abrogated on the part of the state, in that it was protected by the federal Constitution. Unlike the case at bar, the state of Oklahoma was a party to the agreement between the Creek Nation and the United States only to the extent that it agreed to exempt from taxation such property that was exempt by the federal laws, so long as such exemption remained in force; but when such exemption ceased to exist, for any reason, the state was under no further obligation to exempt this property from taxation.

There is another reason why we are of the opinion that the contention of plaintiffs cannot be sustained, and that is: That the source of their title is in the appropriation bill of March, 3, 1903, *supra,* permitting the allottee, Sarah Smith, to convert a part of her allotment into town-site property, with the approval of the Secretary of the Interior. It was upon her application that the re-restrictions upon her alienation of said land were removed. At the time this application was made, the act of Congress of April 26, 1906, was in full force and effect. Except under the act of Congress of March 3, 1903, *supra,* the allottee could not have alienated the lands in question; neither could plaintiffs have obtained any title to the land. Hence it may well be said that it is by virtue

of and through this act of Congress that plaintiffs obtained their title. There is no exemption from taxation contained in this law; neither is any contained in the conveyances made to plaintiffs. The law is well settled that, where land is granted by a particular act, a tax exemption asserted under a prior act will not be upheld. *Armstrong v. Treasurer of Athens County,* 16 Pet. 281, 10 L. Ed. 965; *Lord v. Town of Litchfield,* 36 Conn. 117, 4 Am. Rep. 41; *Southwestern R. R. Co. v. Wright,* 116 U. S. 231, 6 Sup. Ct. 375, 29 L. Ed. 626; *Wilmington & Weldon R. R. Co. v. Alsbrook,* 146 U. S. 279, 13 Sup. Ct. 72, 36 L. Ed. 972; *Ford v. Delta & Pine Land Co.,* 164 U. S. 662, 17 Sup. Ct. 230, 41 L. Ed. 590; *Platt v. Rice,* 10 Watts (Pa.) 352. When the allottee made application to have the restrictions removed, with a view of disposing of said land for townsite purposes, she did so with knowledge of the fact that it would become taxable under the act of Congress of April 26, 1906, and may well be held to have impliedly, at least, consented to subject said land to such burdens. Congress never required the state to exempt this land from state taxation in its present condition; neither did the state agree to so exempt it. All parties dealing with this land dealt with full knowledge of the law. The purpose for which they secured its release from federal control, and the very use to which they expected to put it was wholly inconsistent with continuing the same free from taxation, and plaintiffs must be held to have consented to subject said property to state taxes. This is a reasonable and just construction, in harmony with equity and sound principles. It is likewise in harmony with the views of Justice Brewer, in the case of *Commissioners of Miami County v. Brackenridge, supra,* wherein it is said:

"No government can exist without revenue. There can be no revenue without taxation, and there can be no taxation without property. We claim, then, that the federal government, under the Constitution of the United States, has no power to dispose of the public lands, or to assent to the disposal of them to individuals in fee simple in such a way as to deprive the state of the exercise of its sovereign right to tax them. So long as the lands remain Indian lands, or so long as the government retains an interest in

Form 3

or control over them, the state, by compact in the act of admission, is prohibited from exercising the taxing power in relation to them. But the moment the title passes out of the government and is vested in individuals, the lands become subject to all the laws of the jurisdiction where they are located."

We therefore hold that the property involved is not exempt from taxation; that the judgment of the trial court is contrary to law and erroneous, and must be reversed, with directions to set aside the judgment and render judgment for defendants.

It is so ordered.

All the Justices concur, except KANE, C. J., absent and not participating.