## *BOARD OF COM'RS OF MUSKOGEE COUNTY et al. v. FINK et al.

No. 5481—Opinion Filed February 8, 1916. Rehearing Denied July 25, 1916.

(159 Pac. 470.)

**1. Taxation — Indian Lands — Exemption After Alienation.**

Grantees of a Creek homestead allotment, conveyed under authority of the act of Congress of May 27. 1908, c. 199, 35 Stat. 312, take their title to such allotment under the terms of said act. and cannot go behind it and claim the exemption of such allotment from taxation under the provisions of the act of Congress of June 30, 1902, c. 1323, 32 Stat. 500.

**2. Same.**

Section 4 of the act of Congress of May 27. 1908, providing that all lands from which restrictions have been removed or shall be removed shall be subject to taxation, is a condition attached by Congress to the alienation of the allotments authorized by said act,

---

*Appealed to the Supreme Court of the United States.

and, upon alienation by the allottee, such lands are thereafter subject to taxation.

**3. Same.**

A Creek homestead made alienable by the terms of the act of Congress of May 27, 1908, upon its alienation by the allottee, ceases to be exempt from taxation.

(Syllabus by Rummons, C.)

Error from District Court, Muskogee County; R. P. de Granffenried, Judge.

Action by D. N. Fink and another against the Board of County Commissioners of Muskogee County, Okla., and another. From an order overruling a demurrer to the petition of plaintiffs, the defendants bring error. Reversed and remanded.

See, also, 45 Okla. 121, 145 Pac. 413.

Chas. West, Atty Gen., Smith C. Matson, Asst. Atty. Gen., and W. E. Disney, Co. Atty. of Muskogee county, for plaintiffs in error.

W. C. Franklin, W. O. Cromwell, and Geo. W. Buckner, for defendants in error.

Opinion by RUMMONS, C. Plaintiffs in error, hereinafter styled the defendants, appeal from an order of the district court of Muskogee county, overruling their demurrer to the petition of defendants in error, hereinafter styled the plaintiffs.

The plaintiffs commenced this action against the defendants seeking to restrain and enjoin them from demanding, collecting, or enforcing the collection of any taxes upon certain lots in Cromwell Heights addition to Muskogee, which are a part of lands allotted as a homestead to Eliza J. Murphy, a member of the Creek Tribe of Indians, and of which plaintiffs are the purchasers. Defendants interposed a demurrer to the petition of plaintiffs which was submitted to the court upon the following stipulation:

"The defendants appeared in person and by W. E. Disney, county attorney of Muskogee county, Okla., and plaintiffs appeared by their attorneys W. O. Cromwell and W. C. Franklin, and thereupon said demurrer was argued and presented by counsel upon the ground contained in the petition of plaintiffs, which alone seeks relief by way of injunction restraining the defendants from collecting taxes now or hereafter assessed against the lots and lands of the plaintiffs described in the petition, for the reason that said lots and lands are a part of the homestead of Eliza J. Murphy, a Creek Indian allottee, and a citizen and member of the Creek Tribe or Nation of Creek and Muskogee Indians, and for this reason the said lots and lands described in plaintiffs' petition are nontaxable for the period of 21 years from the date of the deed or patent to said allottee for said homestead; by agreement of counsel the demurrer was urged and submitted solely upon the above question, and said demurrer was re-

served and not passed upon as to any other cause for relief set up in plaintiff's petition."

It seems, under this stipulation, the only question considered by the trial court in passing upon the demurrer was whether or not the lots in question were exempt from taxation because they were a part of lands originally allotted as a homestead to a member of the Creek Tribe. The sufficiency of the other allegations of the petition does not seem to have been argued to the court below, nor is it raised or argued in this court. We will therefore consider this case alone upon the question presented by the stipulation to the trial court.

The land, of which the lots in controversy are a part, was allotted to Eliza J. Murphy, a citizen of the Creek Tribe, as a homestead, by virtue of the act of Congress of March 1, 1901 (31 Stats. 861, c. 676), and the act of Congress of June 30, 1902 (32 Stats. 500, c. 1323). The act of June 30, 1902, known as the Creek Supplemental Agreement, in section 16 provides:

"16. Lands allotted to citizens shall not in any manner whatever or at any time be encumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear."

As provided by the act of June 30, 1902, the deed, conveying the homestead allotted to Eliza J. Murphy, executed April 20, 1903, provides:

"That said land shall be nontaxable and inalienable and free from any incumbrances whatever for 21 years."

Section 1 of the Enabling Act, under which our Constitution was drawn, provides:

"Provided, that nothing contained in the said Constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this act had never been passed." Section 413, Williams' Constitution.

The provisions of the Enabling Act were

adopted by Ordinance Irrevocable of the Constitutional Convention. Section 409, Williams' Constitution. Section 6, article 10, of the Constitution, relating to exemption from taxation, provides, "and such property as may be exempt by reason of treaty stipulations, existing between the Indians and the United States government, or by federal laws." Under the acts of Congress and the constitutional provisions above quoted, and under the provisions contained in the homestead deed to Eliza J. Murphy, the plaintiffs contend that the lots sought to be taxed are exempt from taxation until the year 1924.

The act of Congress of May 27, 1908 (35 Stats. 312), sec. 4, provides:

" * * * That all land, from which restrictions have been or shall be removed, shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes."

Plaintiffs are the grantees of the allottee, Eliza J. Murphy, having purchased her homestead allotment, and are not members of the Creek Tribe. It is contended for the defendants that, because of the provision above quoted in the act of Congress of May 27, 1908, and because title to the homestead allotment is no longer in the allottee, the lots in question have ceased to be exempt and are now subject to taxation.

The plaintiffs rely upon the authority of Choate v. Trapp, 224 U. S. 664, 32 Sup. Ct. 565, 56 L. Ed. 941, and English v. Richardson, 224 U. S. 665, 32 Sup. Ct. 571, 56 L. Ed. 949. In Choate v. Trapp, supra, it was held by the Supreme Court of the United States that the exemption from taxation of the Five Civilized Tribes provided for in the various acts of Congress relating to the allotment of the lands of said tribes constituted a vested right in the allottees, of which they could not be deprived without their consent by any subsequent act of Congress; and that such exemption was not a mere personal privilege of the Indians, but was a property right attached to their land, of which they could not be deprived without their consent. It was further held that the provisions quoted above of section 4 of the act of Congress of May 27, 1908, was inoperative to subject the lands allotted to members of the Choctaw and Chickasaw Tribes to taxation, while the title to such lands remained in the original allottee. The case of English v. Richardson, supra, involving the taxation of a Creek homestead, held that a Creek homestead allottee who received a homestead allotment which was, by the act of Congress providing for the allotment, to be nontaxable and inalienable for a specified period, acquired a vested right to exemption from state taxa-

tion, protected against abrogation by Congress during that period. This case was a companion case to Choate v. Trapp, supra, and was determined by the same opinion. These two cases were determined upon the authority of New Jersey v. Wilson, 7 Cranch, 165, 3 L. Ed. 303.

It was held by Chief Justice Marshall in New Jersey v. Wilson, supra, that:

"A legislative act, declaring that certain lands, which should be purchased for the Indians, should not thereafter be subject to any tax, constituted a contract, which could not be rescinded by a subsequent legislative act."

The Delaware Indians, in consideration of the purchase for them by the colony of New Jersey of the tract of land, ceded to the colony of New Jersey all their claims upon other lands in said colony. The act of the Legislature providing for the purchase of the lands for the Indians restricted them from granting leases or making sales, and provided that the lands to be purchased should not thereafter be subject "to any tax, any law, usage, or custom to the contrary thereof, in any wise notwithstanding." Thereafter, the Delawares desiring to sell the lands so purchased for them, the Legislature of the state of New Jersey passed an act authorizing the sale by the Indians of such lands. In this act no provision was made as to the subject of taxation. Later, the state of New Jersey sought to tax these lands, but were restrained at the suit of the grantees of the Indians. Chief Justice Marshall in his opinion says:

"The privilege, though for the benefit of the Indians, is annexed, by the terms which create it, to the land itself, not to their persons. It is for their advantage that it should be annexed to the land, because, in the event of a sale, on which alone the question could become material, the value would be enhanced by it.

"It is not doubted but that the state of New Jersey might have insisted on a surrender of this privilege as the sole condition on which a sale of the property should be allowed. But this condition has not been insisted on. The land has been sold, with the assent of the state, with all its privileges and immunities. The purchaser succeeds, with the assent of the state, to all the rights of the Indians. He stands, with respect to this land, in their place and claims the benefit of their contract. This contract is certainly impaired by a law which would annul this essential part of it."

Plaintiffs contend, on the authority of New Jersey v. Wilson, supra, Choate v. Trapp, supra, and English v. Richardson, supra, that the exemption from taxation of the homestead of a Creek allottee, by virtue of the Creek Supplemental Agreement, for a period of 21 years runs with the land, and that the

land cannot be subjected to taxation during the prescribed period of exemption, even though the Creek allottee has alienated the lands, and title to the same stands in a person not a citizen of the Creek Tribe.

By the Ordinance of 1787, two townships of land in the state of Ohio were reserved for the purposes of a university. When the state of Ohio came into the Union, an act was passed establishing a university, vesting the lands in a corporation consisting of the president and trustees "for the sole use, benefit, and support of the university forever." The act also provided that the lands should be forever exempt from all state taxes. Thereafter, the Legislature authorized the board of trustees to sell these lands, and pursuant to that statute the lands were sold to individuals, who took title in fee. No exemption from taxation was mentioned in the statute authorizing the sale or in the deeds conveying the lands to the individuals. The grantees claimed the lands to be exempt from taxation by virtue of the first act of the Legislature. The Supreme Court of the United States, in Armstrong v. Athens County, 16 Pet. 281, 10 L. Ed. 965, denied the claim of the grantees. Mr. Justice Catron, writing the opinion of the court, says:

"But what was the policy of the Act of 1826? An entire change of the fund from real estate to a capital in money, vested by loan in the state treasury, was determined on by the corporation. Leave was asked and granted by the Legislature to sell the lands, and convey them in fee simple to purchasers; giving the tenants a preference, in cases where there were existing leases. As regarded the management and nature of the fund to sustain the university, the act of 1804 was to a great extent repealed; by that act the lessees of the corporation were governed; their contracts were founded on it; but with it the purchasers in fee had no concern, their contracts originated in a different policy, and are sanctioned by a different statute; the complainants actually claim, and could only claim, by force of the act of 1826. This act secures the payment of no taxes to the university as the substitute of the state. It simply authorized the corporation to sell, as an individual might sell, and the respective purchasers took title as from an individual; they were strangers to the act of 1804, with the exception of those provided for by the third section of the act of 1826, the value of whose lands were to be governed by the assessment of their rents under the former act, and who were entitled to have deeds in fee on the payment of $100 for every $6 of annual rent assessed upon them, disregarding the taxes they were bound by the act of 1804 to pay to the corporation. The mode of ascertaining the value makes no difference; all the purchasers hold under the act of 1826, and cannot go behind it; and are

subject, like other persons holding lands in fee, to be taxed by the state."

The reasoning of this case is peculiarly applicable to the case at bar. Congress by various acts after the allotment acts, and particularly by the act of May 27, 1908, evidenced a determination to adopt an entirely new plan in dealing with the lands of certain classes of allottees. These classes were to be permitted to deal with their lands as any other citizen of the state might. The free right of alienation was granted to these allottees under the terms of the act of May 27, 1908. We feel convinced that, as the plaintiffs in this case took their title to the lots they are seeking to exempt from taxation by virtue of the terms of this act, they cannot go behind it. But for that act, they could not have purchased the lands in question. They took subject to all the conditions of that act, and they cannot now claim the benefits of the exemption from taxation granted to the allottee by the Creek Supplemental Agreement. Goudy v. Meath, 203 U. S. 146, 27 Sup. Ct. 48, 51 L. Ed. 130.

The act of Congress of May 27, 1908, is a comprehensive revision of the laws relating to the Five Civilized Tribes and their lands and the title thereto, which should be construed so as to give effect to the intent of Congress as evidenced therein. It seems evident from the act that Congress, in the exercise of its plenary power to control the Indians and their affairs, determined that certain classes of citizens should be relieved from their tutelage, and left free to deal with and control their lands as they might see fit. The grantor of plaintiffs was one of the citizens so enfranchised and permitted to alienate her lands at will. Was it the intention of Congress to grant this right of unrestricted alienation to these classes of Indian citizens without condition? It was held in Choate v. Trapp, supra, that the restriction upon alienation and the exemption from taxation were independent of each other, and not so related that the removal of one destroyed the other. In New Jersey v. Wilson, supra, Chief Justice Marshall said:

"It is not doubted but that the state of New Jersey might have insisted on a surrender of this privilege as a sole condition on which a sale of the property should be allowed. But this condition has not been insisted on."

It is clear that Congress could not enact a law depriving the citizens of the Five Civilized Tribes of the exemption from taxation granted them by the acts under which they took their allotments. Nor could Congress compel the allottee to alienate his lands. As a ward of the government, he was subject to the control of Congress in the matter of the

alienation of his lands, and we see no reason to prevent Congress from granting the right of unrestricted alienation upon condition; and, if the allottee accepted the privilege of alienation, he would also accept the conditions imposed upon such privilege.

Can section 4 of the act of May 27, 1908, be construed as imposing a condition upon the right of alienation granted in the act to certain classes of citizens? The primary thing to be considered in the construction of a statute is the intent of the Legislature, and that intent may be arrived at by considering the purpose of the legislation, the subject thereof, and the history of other legislation relating to the same subject.

"A statute should be so construed as to give a sensible and intelligent meaning to every part, to avoid absurd and unjust consequences, and, if possible, so as to make it valid and effective." 2 Lewis Sutherland, Statutory Construction (2d Ed) sec. 516.

"The meaning of the Legislature must be gathered from all they have said, as well from that which is ineffective from want of power, as from that which is authorized by law." Baird v. Hutchinson, 179 Ill. 435, at page 440, 53 N. E. 567, at page 568.

"In construing an act it is a principle of interpretation that the object must be borne in mind, and language susceptible of more than one construction should receive that which will effect its purpose rather than defeat it. * * * A presumption is always indulged in favor of the constitutionality of an act, and that construction will be adopted which will sustain the act, where the language used will permit such interpretation. * * * In construction, words may be restricted or enlarged, according to the intent with which they were used, and their meaning as used may be gathered from the purpose of the enactment. * * * And, when necessary, that which is implied as well as that which is expressed may be held to be included within a statute." People v. Hinrichsen, 161 Ill. 223, at page 226, 43 N. E. 973, at page 974.

"The natural import of words is their literal sense; but this may be greatly varied to give effect to the fundamental purpose of statutes." 2 Lewis' Sutherland, Statutory Construction (2d Ed.) sec. 374.

"In the exposition of a statute, the intention of the lawmaker will prevail over the literal sense of the terms; and its reason and intention will prevail over the strict letter. When the words are not explicit the intention is to be collected from the context, from the occasion and the necessity of the law, from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant with reason and good discretion." 1 Kent's Commentaries, 461.

Under these canons of construction, taking into consideration the subject of the act of Congress of May 27, 1908, and the long history of legislation by Congress as to the Five Civilized Tribes and their lands, we are convinced that the purpose of Congress in exempting the homestead allotments of the Creek Tribe from taxation, and requiring the state of Oklahoma in its Constitution to give effect to the exemption so granted, was solely for the protection of the members of the Creek Tribe; that Congress intended by the Supplemental Agreement to convey to the members of the tribe homesteads which could not be taken from them for the payment of taxes. The constitutional provision of the state of Oklahoma quoted above gives full effect to the purpose of Congress. But can it be said that, when Congress determined that certain classes of Creek citizens were competent to attend to their own affairs and to alienate their lands at will, it also intended that such lands should continue to escape the burdens of government after they had passed from the hands of the Creek citizen? Such a conclusion would lead to the greatest discrimination and injustice between citizens and would so derogate from the power of taxation essential to the maintenance of government that we do not think that the act of Congress of May 27, 1908, is open to this interpretation. As was said by the Supreme Court of the United States, the exemption from taxation of the lands of the Indians is a valuable right; but is not the right to freely alienate one's lands also a valuable right? We think there can be no doubt that it is a right of the highest value. The history of the law of tenures of real estate in England, and the shifts and devices invented and used by the English lawyers of the middle ages, such as fine and recovery, to evade the statute de donis and to enable English landowners to break the entail and freely convey their lands, show that, at all times under our system of real estate law, the right to alienate one's real estate unrestricted has been most highly prized by the landowner. We think the intent of Congress by that act was to say to the Creek citizen, "We have given you lands which are nontaxable and inalienable for 21 years; the exemption from taxation adds value to your lands; the restriction upon alienation impairs that value; we will now offer you the privilege of unrestricted alienation, but, if you elect to avail yourself of this privilege, your lands will, upon alienation, become subject to taxation in the hands of your grantee." We think Congress clearly had authority to remove the restrictions upon alienation upon such a condition, and, if the Creek citizen undertook to avail himself of the privilege of alienation, the subjection of his homestead to taxation thereafter would not deprive either him

or his grantee of any vested right, nor would it be in contravention of the Fifth Amendment to the Constitution of the United States. We are not without authority on this question from our own court. The act of Congress of April 26, 1906 (34 Stats. 144, c. 1876), sec. 19, provides:

"Provided further, that all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee."

In the case of Schock v. Sweet, 45 Okla. 51, 145 Pac. 388, this court held that the homestead conveyed by an allottee, whose restrictions were removed under the provisions of the act of Congress of March 3, 1903 (32 Stats. 996, c. 994), after the taking effect of the act of April 26, 1906, was subject to taxation after alienation by the allottee. Mr. Justice Riddle, delivering the opinion of the court, says:

"The purpose for which the exemption was made has ceased to exist, and the exemption itself must fall. In construing all laws, it is the cardinal rule to ascertain the intent of the lawmakers. There is nothing in this provision of the agreement, or in any prior or subsequent acts of Congress dealing with these Indian tribes, that evidences a purpose in Congress to grant an exemption from taxation of the property in question in the hands of third parties, who are not members of said Indian tribes. On the contrary, the provision of the act of April 26, 1906, expressly provides that the homesteads shall be nontaxable so long as the title remains in the allottee, which is equivalent to saying that, when the title passes out of such allottee, the land shall be subject to taxation. * * *

"It was upon her application that the restrictions upon her alienation of said land were removed. At the time this application was made, the act of Congress of April 26, 1906, was in full force and effect. Except under the act of Congress of March 3, 1903, supra, the allottee could not have alienated the lands in question; neither could plaintiffs have obtained any title to the land. Hence it may well be said that it is by virtue of and through this act of Congress that plaintiffs obtained their title. There is no exemption from taxation contained in this law; neither is any contained in the conveyances made to plaintiffs. The law is well settled that, where land is granted by a particular act, a tax exemption asserted under a prior act will not be upheld." Rider v. Helms, 48 Okla. 610, 150 Pac. 154; Rogers v. Herndon, 55 Okla. 1, 154 Pac. 1185.

The only distinction between the case of Schock v. Sweet and the case at bar lies in the fact that, in that case, the restrictions of the allottee were removed by order of the Secretary of the Interior upon application of the allottee, while in the case at bar the restrictions were removed by virtue of the act

of Congress of May 27, 1908. We think the case of Schock v. Sweet, supra, settles the law of this state adversely to the contention of plaintiffs.

We therefore conclude that the trial court erred in overruling the demurrer of defendants to the petition of plaintiffs, and that this cause should be reversed, with directions to the trial court to sustain such demurrer.

By the Court: It is so ordered.